# IN THE SUPREME COURT OF THE STATE OF DELAWARE

IN THE MATTER OF A MEMBER
OF THE BAR OF THE SUPREME
COURT OF THE STATE OF
DELAWARE:

RONALD G. POLIQUIN,

Petitioner.

§
§  No. 129, 2016
§
§  Board Case No. 112318-R
§
§
§
§

Submitted: March 29, 2016
Decided: April 5, 2016

Before **HOLLAND**, **VAUGHN**, and **SEITZ**, Justices.

## ORDER

This 5th day of April 2016, it appears to the Court that:

(1)    On August 9, 2012, this Court suspended the petitioner, Ronald G. Poliquin, from the practice of law for a period of six months and one day.[1]  On February 21, 2014, we denied Poliquin's first petition for reinstatement.[2]  He filed his second petition for reinstatement on June 8, 2015.  The Office of Disciplinary Counsel ("ODC") filed a response in opposition to the petition for reinstatement.  A panel of the Board on Professional Responsibility held a hearing on the petition on November 10, 2015, and post-hearing briefing concluded on January 15, 2016.

---

[1] *In re Poliquin*, 49 A.3d 1115 (Del. 2012).
[2] *In re Poliquin*, 2014 WL 708482 (Del. Feb. 21, 2014).

(2)    The panel filed its Report and Recommendation with this Court on March 15, 2016. The panel found that Poliquin has met the standards for reinstatement and recommends that he be reinstated subject to a two-year period of probation with specific conditions attached to his probation. Neither the ODC nor Poliquin has filed any objections to the panel's Report and Recommendation.

(3)    The Court has reviewed the Report and Recommendation carefully. The Court has determined that the panel's Report and Recommendation should be adopted in its entirety.

NOW, THEREFORE, IT IS ORDERED the panel's Report and Recommendation is hereby ACCEPTED. Ronald G. Poliquin shall be reinstated, effective immediately, as a member of the Bar of this Court subject to a two-year period of probation with all of the conditions set forth in the attached Report.

BY THE COURT:

_____
Justice

2

In the Matter of a )
Member of the Bar of ) CONFIDENTIAL
the Supreme Court of )
Delaware: ) Board Case No. 112318-R
)
RONALD G. POLIQUIN, )
Respondent. )
)

## REPORT AND RECOMMENDATION
### ON
### PETITIONER'S SECOND REINSTATEMENT PETITION

This matter is before a Panel of the Board on Professional Responsibility ("Panel") on Petitioner's second Petition for Reinstatement following his suspension from practice for six months and a day. Members of the Panel were Richmond L. Williams, Esquire (chair), Deirdre McCartney, Esquire and Deborah L. Miller, Ph.D. The Office of Disciplinary Counsel ("ODC") opposes this petition, claiming that the Petitioner has failed to meet his burden of proving by clear and convincing evidence that: "(1) his professional rehabilitation; (2) his fitness to practice; (3) his requisite honesty and professional integrity to resume the practice of law; and (4) his resumption of the practice of law will not be detrimental to the administration of justice."[1] A hearing was held on November 10, 2015. Following the hearing the Panel asked for briefing. Briefing was concluded on January 15, 2016. This is the Panel's Report and Recommendation on Petitioner's Second Reinstatement Petition.

### Procedural History

Petitioner was admitted to the Bar of the Supreme Court of Delaware in 2003. At all times thereafter, until his suspension, he was engaged in the private practice of law.

On August 9, 2012 Petitioner was suspended from the practice of law for 6 months and a day, following a series of complaints to ODC that began in 2006.[2] By adopting the Report and Recommendation of the Board on Professional responsibility, the Court held that Petitioner

---

[1] ODC's ANSWERING MEMORANDUM IN OPPOSITION TO PETITIONER'S REINSTATEMENT (hereinafter "ODC Opposition") at 1.
[2] *In re Poliquin*, 49 A.3rd 1115 (Del.2012) (hereinafter "*Poliquin I*").

violated Delaware Lawyers' Rules of Professional Conduct 1.1, 1.3, 3.4(c), 3.4(d), 8.4(c) and 8.4(d).[3]

Petitioner filed his first Petition for Reinstatement on May 13, 2013 after advising ODC of his intent to seek reinstatement and submitting a completed Reinstatement Questionnaire.[4] By its Order dated February 21, 2014, the Court denied the Petition.[5] It specifically approved the Board's findings stating:

> ... the Board concluded that that Petitioner had not demonstrated by clear and convincing evidence (i) that he is professionally rehabilitated, (ii) that he is fit to practice, (iii) that he has not engaged in any other professional misconduct, (iv) that his readmission would not be detrimental to the administration of justice. Finally, given its findings that Petitioner has not sufficiently overcome his performance related issues, the Board concluded that Petitioner's reinstatement would be prejudicial to the administration of justice. We agree.[6]

Petitioner filed his second Petition for Reinstatement on June 8, 2015. ODC opposed the Petition in its Answer dated July 14, 2015. A hearing was scheduled for September 24, 2015. The hearing was postponed to allow the parties to advise the Panel regarding the issues surrounding ODC's request that Petitioner undergo additional neuropsychological testing. Upon the Panel's determination that it would not require Petitioner to undergo additional testing, the hearing was conducted on November 10, 2015. The record closed on January 15, 2016 with the conclusion of post hearing briefing.

In the post hearing briefing regarding the second Petition, an issue was raised about the scope of the hearing. As was reflected in *Poliquin II*, the Petitioner has the burden of demonstrating by clear and convincing evidence that he meets the requirements of Rule 22(g) of the Delaware Lawyers' Rules of Disciplinary Procedure[7] and that he has overcome his performance related issues. The background of this issue is provided by an email exchange between the Panel Chair and counsel for the parties. Following a teleconference with counsel, the Panel Chair wrote:

> In the conference, ODC confirmed that the issue of whether Mr. Poliquin has made sufficient progress in addressing the impacts of his ADHD on his ability to practice is the sole basis for its objections to Mr. Poliquin's reinstatement. ...
>
> If I have misstated the position of any party or the issue or have omitted anything important to the steps needed to resolve this issue, please bring it to my attention.[8]

---

[3] *Id.,* at 1131.

[4] *In re Poliquin,* 86 A.3rd 1119 (Del.2014) (hereinafter *"Poliquin II*)
[5] *Id.*
[6] *Id.*
[7] Hereinafter, the "Rules."
[8] Poliquin Letter submission, September 28, 2015, Exhibit 21

In his email of October 30, 2015, the Panel Chair determined that the Panel would not compel Petitioner to undergo additional testing as recommended by ODC.[9] Again, the focus of this email and the Panel's expectations of the hearing, based upon the representations of the parties, was that the main focus would be whether Petitioner has met his burden of showing that he was able to perform the functions of a lawyer (in other words, whether the deficits identified in prior testing had been addressed). At no point prior to the commencement of the hearing did ODC advise the Panel that ODC opposed the petition on any other basis.

At the hearing, the question of the scope of the hearing was again raised by the parties. The Panel Chair stated that the Panel has an obligation to determine whether the Petitioner has met his burden of establishing by clear and convincing evidence that he has met the criteria of Rule 22. However, the main focus of the hearing was the attentional issue.[10] Neither party took issue with this characterization of the focus of the hearing.

## Facts

The record in this proceeding consists of the testimony of witnesses at the hearing, exhibits submitted in connection with the hearing and other submissions of the parties. The Joint Exhibits include the transcripts of the prior hearings on reinstatement (August 21, 2013 and September 30, 2013) and numerous reports and recommendations. This evidence will not be restated or summarized, except to the extent necessary to address the issues relevant to the Petition and ODC's opposition.

In a report dated August 13, 2014, Dr. Edwin Oliver stated, "[Petitioner] exhibited a rare 36 point difference between his Working Memory and Verbal Comprehension." His working memory was significantly below average and this was a significant factor in the attentional problems.[11] Dr. Oliver summarized the issue in his report as follows:

> There is significant scatter in Mr. Poliquin's WAIS-IV profile that makes his Full Scale IQ to be essentially meaningless. In his verbal profile he exhibited a rare 36 point difference between his Working Memory and Verbal Comprehension composite scores. This clinically significant and highly unusual finding would surely explain a great deal of the frustration he experiences with retaining information, especially details such as figures and numbers. Given his 4th percentile Working Memory scale score, it is easy to see that Mr. Poliquin requires a great deal of effort and repetition in order to retain meaningfully, or ultimately comprehend some material. Given his High Average Verbal Comprehension score, one would expect (theoretically) a score in about the same range on the Perceptual Reasoning scale. However, again his scores were quite

---

[9] Attachment to Poliquin Reply Memorandum of January 15, 2015 (Poliquin Reply). We would note that ODC did not affirmatively seek to compel the additional examination, but requested it informally.

[10] Transcript of the Hearing dated November 10, 2015 ("Tr."), at 11-13.

[11] Joint Exhibits at the November 10, 2015 Hearing ("Joint Exhibits"), at Tab 10

discrepant (18 point difference), indicating that abstract (figural) information can also be quite taxing for him. I believe that deviations and discrepancies such at the ones that he displays make work often tiring, challenging and leave him quite vulnerable to stress and other complications, like addiction.

*Id.*, at 2. Dr Oliver then concluded by stating: "While I see problems sustaining focus and attention with certain tasks, such as short term retention, I don't think that this definitively proves that he has a pure attention problem. Rather, attention problems can be secondary to other biologic or environmental problems or stress, or a combination of these." *Id.*

The record reflects that after this evaluation, Petitioner continued to address behavioral issues that would improve his performance and obtained a prescription for Strattera. In correspondence between Petitioner's counsel at the time and ODC, after the petition for reinstatement was filed, ODC emphasized that, particularly in light of Dr. Oliver's findings, petitioner needed to be able to demonstrate that he has addressed his performance issues. ODC also pointed out that while Petitioner had obtained a prescription for Strattera, he needed to provide "objective evidence documenting cognitive improvement resulting from the medication or otherwise."[12]

As a result, petitioner arranged to have an evaluation by Dr. Christianne Hopwood.

Christianne Hopwood, Ph.D. was the first witness at the hearing. She testified that she was retained by Petitioner "to assess whether there was a difference in his performance now that he was taking Strattera."[13] Her evaluation report of the Petitioner concluded that his attentional issues had significantly improved compared to what was reported by Dr. Oliver. She described in detail the tests and evaluation she conducted. She indicated that in making her determination she considered the clinical interview, information from collateral sources and neuropsychological testing.

As part of the evaluation relating to collateral sources, she considered the documents from the court proceedings, references, doctor's evaluations and all other sources of information that was provided to her. She specifically addressed all of the criticisms that Dr. Mack raised about her report.[14] She concluded that she felt strongly that the Petitioner is capable of performing his job as an attorney.[15]

On cross examination, ODC questioned whether Dr. Hopwood had reviewed all relevant records. Her response was that she had reviewed and considered them in giving her opinion. Based upon our review of her testimony and the exhibits, the Panel accepts her testimony.[16]

---

[12] Letter from ODC to Andre Beauregard, Dated February 27, 2015, at 2.

[13] Tr., at 16.

[14] Tr., at 23-27.

[15] Tr., at 27.

[16] *See, generally,* Tr., at 27-51. *See also,* our discussion at page 6, below.

4

In response to a question by Panel Member Miller, Dr. Hopwood testified that although the specific diagnosis of ADHD is not clear (meaning it is not clear that Petitioner met the specific criteria for this diagnosis and that it is not clear that a professional followed the precise protocol to make that diagnosis), "he has symptoms consistent... with it."[17] She also testified that regardless of the cause of the memory and attentional issues, the things that are done to remedy them are the same.[18] Dr. Hopwood's opinion is that the improvement shown through testing is the result of Petitioner's prescription for Strattera and lifestyle changes he has made, including getting more sleep and exercise.[19] She believes that he will be able to maintain his higher level of performance because he is highly motivated to perform at that level in the future.[20]

Alice O'Brien testified that Petitioner has fully cooperated and has followed through on all of the recommendations given to him regarding ways to address the problems that led to his suspension.[21] These include time management techniques, the Delaware Lawyer's Assistance Program (DELAP) workshops on avoiding procrastination, faithful participation in Narcotics Anonymous and becoming more involved with his church and faith. Her opinion is that Petitioner has addressed the issues that led to his suspension, which in her mind were primarily attentional and organizational issues.

Carol Waldhauser, the Executive Director of Delaware Lawyers Assistance Program (DELAP) testified that Petitioner contacted her in 2011 (before his suspension).[22] He signed a "Blueprint for Change" agreement with DELAP that included inpatient treatment for substance abuse, random drug screening, counseling and periodic check-ins with DELAP. He successfully completed the inpatient program at Caron and continues to adhere to his agreement today. She supports his reinstatement. If Petitioner is reinstated, Ms. Waldhauser would recommend that the random drug screening program continues.

ODC has attempted to make a point in its cross examination of Ms. O'Brien and Ms. Waldhauser that, in his ongoing treatment and other activities to address his performance issues, he was not complaining about attentional issues. These witnesses explained that their focus with him was to help him perform appropriately, and they were primarily concerned that he did the specific things he promised to do and was able to successfully perform at work. Thus while these issues were addressed, it was more indirectly and more focused on the solutions.[23] The Panel finds that ODC's suggested interpretation of the testimony of these witnesses (that the work with them somehow didn't address/involve the attentional issues) is strained. From listening to the testimony as a whole, it is clear to the Panel that the foundation of the relationship between

---

[17] Tr., at 55.
[18] Tr., at 55-56.
[19] Tr., at 58-59.
[20] Tr., at 59-60.
[21] Tr. at 62-69.
[22] Tr., at 94.
[23] See, e.g., Tr., at 79-82, 100-110.

Respondent and both Ms. O'Brien and Ms. Waldhauser was the need to address a variety of problems, starting with the addiction and then moving to the attentional issues.

In its argument, ODC asks the Panel to conclude:

1. "Poliquin never told the experts about his systematic failure to meet his professional obligations and his inability to correct those failures despite implementation of practice management techniques."[24]
2. "Poliquin is incapable of changing his behavior to meet his professional duties owed to clients, the courts, and the legal profession."[25]

The record does not support these arguments. Dr. Hopwood was aware of the circumstances that led to Petitioner's suspension and had reviewed relevant information.[26] While it is possible that some specific document was not given to her, ODC has not pointed out any material document that was omitted. In other words, ODC was not able to show that her opinion would have been different had she been given any particular piece of information that was omitted. The panel notes that, in being questioned by ODC, Dr. Hopwood gave a very concise and accurate description of the issues that led to his suspension.[27] She also knew the progression of his attempts to address his problems.[28] This is quite persuasive in convincing the Panel that Dr. Hopwood did, indeed, understand the issues she was dealing with. Although, Ms. O'Brien acknowledged that she did not have all of the formal documents regarding Petitioner's disciplinary history,[29] her testimony demonstrated that she was quite aware of his performance problems and was working to help him develop ways to address them.[30] ODC's proposed conclusion is completely at odds with the overwhelming evidence on the record before the Panel.

The Panel similarly finds ODC's position that Petitioner "is incapable of changing his behavior..." is not supportable when viewed in light of the undisputed evidence on the record. All experts, including ODC's expert Dr. Mack, support the conclusion that the problems encountered by Petitioner <u>could</u> be addressed. All, including Dr. Mack, acknowledged that the evidence demonstrated that change <u>had</u> taken place.[31]

Mr. Andre Beauregard testified that his firm has employed Petitioner as a law clerk since Petitioner's suspension. He testified in detail about the work Petitioner did for the firm and stated

---

[24] ODC at 21.

[25] ODC at 21.

[26] Tr., at 21, 34-40.

[27] Tr., at 39.

[28] Tr., at 37-49.

[29] Tr., at 83-88.

[30] Tr., at 63-67.

[31] Tr., at 251. Dr. Mack did not believe that the change in test scores was sufficient and appeared to ignore the testimony of the people who observed his behavior on a day to day basis in concluding that the change was not enough. This is evidenced by the fact that although given the opportunity to hear all witnesses at the hearing he didn't bother to take advantage of that opportunity. Tr., at 254.

6

without qualification that Petitioner was capable of meeting the standards of a Delaware attorney.[32]

Sean Lynn, a Delaware attorney since 2005, Father James Lentini (Respondent's Pastor) and Bill Moser (Respondent's Narcotics Anonymous sponsor) all testified in support of Petitioner's reinstatement.[33] They testified about his character, his remorse, his involvement in the community and his honesty and integrity. All supported his reinstatement.[34]

Mr. Poliquin testified on his own behalf.[35] He acknowledged the failings that led to his suspension.[36] He expressed remorse for his wrongful conduct and for harming the institution of law.[37] He testified at length to the steps he took to address the causes of failure to meet the standards, including what has been described before as his performance issues.[38] In cross examination, ODC questioned a number of areas. One of which became a theme in its brief suggesting that Mr. Poliquin had a candor problem. One example is the question of what representations were made when Petitioner went to Mind & Body Consortium to seek a prescription for Strattera. His direct testimony was:

> Q: There was something about at the Mind and Body Consortium you had made reference to you were having problems with doing assignments, clarity, focus. Was that at that time you went or were you relating what the problems were in the past?
>
> A: That's not what I presented to them. I presented, I said—first I told them I had this evaluation taken and my counselor is recommending Strattera. And I told them about my past issues with my ADHD and how I was handling it at that point. I did not say that I was having issues as a law clerk at that point in time. That was a mistake. [39]

On cross examination, Petitioner agreed that he did not require Mind & Body Consortium to correct this error, but he does not concede that the entry in its records is correct. However, in its brief, ODC uses this inaccurate entry as a basis to argue that Petitioner was not candid with that provider.[40] The record does not support ODC's argument that the entry is evidence of dishonest behavior on the part of Petitioner.[41] While it is true there are some mistakes and inconsistencies

---

[32] Tr., at 112-116.

[33] Tr., at 131-148.

[34] The Panel also notes the transcripts of the prior reinstatement hearings that have been made a part of the record before it. See, Exhibits 3 and 4. They contain additional character evidence in support of his good character.

[35] Tr., at 148-208.

[36] Tr., at 153-158.

[37] Tr., at 158-160.

[38] Tr., at 150-153.

[39] Tr., at 157.

[40] ODC at 29.

[41] Similarly, the Panel does not find the argument raised by ODC regarding Petitioner's failure to list Dr. Villabona in the prior petition to suggest dishonesty. As Petitioner noted in response to cross examination, although he failed

in the record of Petitioner since his suspension, mistakes and inconsistencies can be found in the work product of all honest and well intentioned parties, including counsel for both ODC and the Petitioner in this proceeding and, no doubt, this Report and Recommendation.

The Panel has carefully looked at the evidence relevant to this issue. The Panel finds that ODC presents a strained interpretation of the evidence by suggesting Petitioner has demonstrated neither honesty nor rehabilitation. The interpretation that is best supported by the evidence on the record is that Petitioner has demonstrated his ability to meet deadlines and prioritize and to honestly deal with life's adversities. This ability has significantly improved as a result of his diligently pursuing a number of approaches, including counseling by Mr. Widder and Ms. O'Brien, organizational techniques, spiritual counseling, Narcotics Anonymous, support of DELAP, support of his employer, friends and family, his strong motivation to resume practice as a lawyer and, finally, his prescription for Strattera. Most of ODC's points suggesting inability or failure to change are from the period prior to Petitioner's suspension. The evidence following his suspension is overwhelmingly of success in addressing his performance issues. His last petition was denied, not because he had not progressed, but because he had not put on sufficient evidence to meet his burden in all areas.

In opposition to the petition for reinstatement, ODC presented only one witness, Jonathan H. Mack, Psy.D. Dr. Mack was given the opportunity to be present during the testimony in the hearing but chose to be present only during part of the testimony and had previously reviewed the records relating to the neuropsychological assessments and had issued his own report based upon his evaluation.[42] Dr. Mack explained that he was a "Forensic Psychologist." He testified that his role was to look at the root cause of the issue "objectively" rather than to advocate for the patient's recovery.[43] According to Dr. Mack the first part of the assessment requires examination of the individual to determine his mental state, the second part requires review of records and collateral sources and the third part is testing.[44] These are the "three legs of the stool" on which forensic neuropsychological and psychological evaluations must be based.[45] He testified at great length about what review should have been conducted in his view and, it seems, concluded that there was insufficient information to determine if the Petitioner's performance issues had been addressed in a satisfactory manner.[46] However, at the end, in response to a question from the Panel Dr. Mack was unable to state whether the additional evaluative measures he recommended would be a better predictor of whether or not the Petitioner would be able to

---

to list the doctor in the petition, he did disclose the doctor throughout the process and had provided authorizations for access to all records from people who provided treatment, including Dr. Villabona. Tr. at 176-177.

[42] The report was introduced into evidence and is identified as Exhibit ODC 7.

[43] Tr., at 210-212.

[44] Id.

[45] Tr., at 211-212.

[46] Tr., at 212-250.

perform appropriately as a lawyer than the testing already administered.[47] The Panel is unpersuaded by Dr. Mack's testimony largely because of what it perceives is his lack of objectivity and lack of consistency between his stated approach to evaluation and the approach he actually took. By failing to give weight all of the information available through collateral sources, Dr. Mack fails to follow his own protocol in developing his opinion about Respondent's fitness to practice. Specifically, he ignored the extensive and entirely unrebutted testimony of witnesses about Respondent's progress in resolving the areas of deficiency that led to his suspension (focus and integrity). Similarly, he ignored the battery of tests, in addition to the WAIS IV test, administered by Dr. Hopwood.

## Discussion

The Panel notes that reinstatement can occur in two contexts, suspension and disbarment. Under Rule 22(a) lawyers suspended for more than six months have to apply for reinstatement, which requires proof of rehabilitation and a final order of reinstatement by the Court. As was noted above, since the Petitioner was suspended for more than six months, he has the burden of establishing by clear and convincing evidence that he has met the criteria for reinstatement under Rule 22(g). Rule 22(g) requires that the petitioner prove (1) his professional rehabilitation, including substantial rehabilitation from his drug problem; (2) his compliance with all applicable disciplinary orders; (3) his fitness to practice; (4) his overall competence and awareness of recent developments in the law; (5) that he has not engaged in professional misconduct in other jurisdictions; (6) that he sincerely recognizes the wrongfulness and seriousness of his misconduct on which his suspension was predicated; (7) that he has the requisite honesty and professional integrity to resume the practice of law; and (8) that his resumption of practice will not be detrimental to the administration of justice.

The ethical violations leading to Petitioner's suspension from practice were violating deadlines established by the Supreme Court, Superior Court and Family Court, failing to provide competent representation, failing to act with reasonable diligence and promptness in several situations and failing to act with appropriate candor to the Supreme Court.[48] They were brought about and exacerbated by his difficulty focusing and dealing with stress in a very full practice and his addictions. While these were serious infractions and suspension was necessary to protect the public from a pattern of conduct that caused actual and threatened harm to his clients and the administration of justice, they were not of the nature to result in a longer suspension or even disbarment.

Cases involving reinstatement proceedings cited by ODC in its brief involved petitions for reinstatement from disbarment, where the underlying misconduct was serious misconduct such as theft from clients. See, *In re Reed*, 584 A.2d 1207 (Del. 1990)(disbarred after conviction for theft following a series of other disciplinary actions), *In re Bennethum*, 278 A.2d 831 (Del. 1971)

---

[47] Tr., at 258-259.
[48] Poliquin I.

9

(disbarred as a result of being convicted of giving false testimony and fabricating evidence in his criminal trial for willful failure to file tax returns) and *In re Hawkins*, 87 A. 243 (Del. 1913)(disbarred after being convicted of embezzlement from a client) and cases on reinstatement like *In re Clark*, 406 A.2d 28 (Del. 1979) (cited in Reed) (disbarred after diverting approximately $100,000 from his clients). The Panel finds *In re Pankowski*, Del.Supr., No. 503, 2013, Jacobs J. (October 13, 2014) more helpful in that it specifically addressed a similar situations to that leading to Petitioner's suspension, where the attorney had an alcohol addiction that contributed to the behavior leading to his suspension.

With these distinctions in mind the Panel will review the criteria of Rule 22(g) in order.

### 1. *Professional Rehabilitation.*

To satisfy this element, Petitioner must establish that he has addressed both his drug problem and the underlying cause of his performance issues. The evidence is uncontroverted that Petitioner successfully completed his inpatient treatment for his addiction and has passed numerous random drug tests. He also remains active in Narcotics Anonymous from the time of his inpatient treatment to the present. It is now 5 years since Petitioner contacted DELAP. It is approximately four and three-quarters years since he underwent inpatient treatment. He remains drug free. We conclude that he has proven by clear and convincing evidence that he has his drug problem under control.

In the prior order denying reinstatement, the Court adopted the Panel's recommendation that found that the Petitioner had failed to establish by clear and convincing evidence that his performance issues had been addressed. We commend ODC for pointing out to Petitioner that he needs an objective basis to support his contention that these issues have been addressed and recommending that he be retested after beginning Strattera, in light of the results of the Oliver evaluation. This does not mean that "rehabilitation" can only be shown by expert testimony and psychological testing.

Under the specific circumstances of this matter, however, where Dr. Oliver's report raised significant questions about whether the underlying issues that led to Petitioner's performance issues had been resolved, it seems appropriate that Petitioner sought and obtained the professional evaluation by Dr. Hopwood. As *In re Clark*, 406 A2d 28, at 30 (Del. 1979) noted, "although precedent from this and other jurisdictions should be weighed as guidelines of discretion, each case must rise and fall on its own facts and circumstances."

In the hearing before this panel there was a significant amount of evidence presented regarding whether Petitioner has addressed his performance issues. Petitioner has taken extensive measures to address the root causes of his performance issues. Not only did he take a number of corrective actions to improve his organizational abilities and the DELAP sponsored workshops to combat procrastination, but he continues to employ the techniques in his role as a law clerk. Multiple lines of evidence support this finding.

10

As discussed previously, upon advice of Ms. O'Brien, Petitioner obtained a prescription for Strattera, a non-narcotic medication that is used to treat attentional issues. Petitioner then asked Dr. Hopwood to evaluate him to determine if testing and evaluation could provide an objective basis to establish that he had addressed the attentional and performance issues. She interviewed Petitioner, reviewed relevant records and administered what she determined were the appropriate tests to evaluate whether he suffered from attentional issues that would prevent him from functioning as an attorney. She specifically testified that the WAIS test was valid when given a second time seven months later.[49] However, she also administered a number of other tests and did not rely on that test exclusively. Dr. Mack challenged her opinion and methodology, stating that she didn't do enough to be able to reach the conclusions she did. Notably, however, he could not state that the additional testing he suggested would provide any greater degree of certainty. In addition, he appeared to ignore the significant body of evidence in the form of letters from people who knew, worked with and counseled Petitioner suggesting that he had vigorously applied himself to addressing his problems and has done so successfully. In fact Dr. Mack fails to acknowledge that Dr. Hopwood followed the very process that he said needs to be followed in evaluating a person and, from the Panel's perspective, failed to follow his own advice in by failing to give weight to all three areas (interview/assessment, review of collateral sources/records and testing).

Dr. Hopwood found, through testing, that working memory and other components of his intellectual functioning that had been below normal or created anomalous results in Dr. Oliver's testing had normalized. She found, through the WAIS test and other tests, that his executive function was within normal range. She determined through her review of the totality of the information at her disposal that Petitioner would be able to meet deadlines and handle the shifting priorities that are involved with the practice of law.

The Panel does not accept Dr. Mack's implied assertion that fitness to practice could only be determined by a large battery of additional tests that he would define. Nor does the Panel accept Dr. Mack's suggestion that such tests would be determinative, at the exclusion of all other evidence. We find that this is contrary to both the decisions of the Court to date and the expert testimony regarding how neuropsychological/cognitive issues are evaluated by the profession. It is up to the Court, not a single professional, to determine the criteria by which rehabilitiation (and, generally, fitness to practice law) would be determined.

Following our careful review and weighing of the evidence and conflicting expert testimony, we conclude that Petitioner has established by clear and convincing evidence that he has addressed the attentional issues that gave rise to his performance issues.

---

[49] Dr. Hopwood testified that "practice effects are substantiated up to about six months." Tr. at 18. We take this to mean that the test can be validly administered after 6 months. As she testified in detail, this was not the only test she used to come to her conclusions. Tr. at 16-20. With her extensive professional experience, including as a professor of Neuropsychology at St. Joseph's University and Temple University (including overseeing doctoral candidates at Temple), the Panel is satisfied that Dr. Hopwood's testimony is competent on these issues.

11

## 2. Compliance with applicable disciplinary orders.

In the Order denying the Petitioner's first petition for reinstatement, the Court directed that, during the period of suspension, Petitioner will cooperate with the ODC in its efforts to monitor his compliance with the suspension order, he must remain active with DELAP and submit to any drug or alcohol testing deemed appropriate.

The evidence is uncontroverted that the Petitioner has remained clean since his inpatient treatment in 2011 and has cooperated with DELAP. The evidence in the record before the panel suggests that Petitioner has cooperated with ODC's efforts to monitor his compliance with the terms of his suspension. Nor does the panel understand ODC to argue that Petitioner has not met this standard.

Accordingly, the Panel finds that the Petitioner has met his burden of establishing by clear and convincing evidence that he has complied with applicable disciplinary orders.

## 3. Fitness to Practice.

As was noted in the prior Panel's report denying the first petition for reinstatement, there is overlap between this standard and "professional rehabilitation" under the first criterion. Here the question is whether the conditions that caused Petitioner to allow his cases to fall into disarray have been addressed and whether there are any impairments that would prevent him from meeting his obligations as an attorney.

As was noted in *In re Johnson*, 298 P.3rd 904 (Ariz. 2013), it is not the specific underlying mental condition or diagnosis that is critical, but whether steps to address the conduct leading to the discipline have been addressed in an appropriate manner. See, *In re Pankowski* (adopting the Board's Report referring to *In re Johnson*). *In re Hirsh*, 95 A.3d (Vt. 2014) looked at the question of fitness in the context of an application for admission to the bar. The Panel believes the underlying principles are instructive here. First, *Hirsh* supports the position that it is inappropriate to look to a person's mental health status as a basis for a determination of his or her fitness to practice. Rather it is appropriate to look to his or her conduct or behavior. Second, the key behaviors with respect to fitness of a lawyer are the ability to make proper presentations of fact and law on behalf of a client and to focus on the client's needs in and out of court.

Although his first petition was dismissed because Petitioner failed to establish rehabilitation and that he was capable of meeting the minimum standards for functioning as an attorney, that deficit has been addressed in the present hearing. The record is replete with professional testimony that establishes Petitioner has the capability to fulfill these obligations and other testimony that he is motivated and, in his role as a law clerk, has shown the skills necessary to function capably as an attorney.

12

In addition, the lay witnesses (members of the bar and respected members of the community) testified that he was a loving father, dedicated provider, who is honest and caring and has the requisite good character to practice law in Delaware.

The Panel finds that Petitioner has demonstrated by clear and convincing evidence that he is fit to practice law.

### 4. Competence

Petitioner put on unrebutted evidence in the form of testimony of his employer that he is up to speed with the law and would be competent if he were reinstated. ODC does not oppose his reinstatement on this ground. The Panel finds that Petitioner has established by clear and convincing evidence that he is competent to practice.

### 5. Absence of other professional misconduct.

There is no evidence on the record of other professional misconduct. Thus Petitioner has carried his burden on this element.

### 6. Petitioner's recognition of his prior wrongful conduct.

Petitioner's testimony at the hearing and testimony of his friends, pastor and counselors all support the finding that Petitioner recognizes the wrongfulness and seriousness of his prior conduct. This testimony is unrebutted. Thus the Panel finds that Petitioner has established this element of the test by clear and convincing evidence.

### 7. Petitioner has the requisite honesty and professional integrity.

It should be noted that one of the violations that led to Petitioner's suspension was his lack of candor to the Court, in his failure to correct a misstatement by his counsel until after the Court had issued a disciplinary order in a Rule to Show Cause hearing. The Panel concludes, based upon its review of the record, which includes testimony of character witnesses and his employer and the experts who testified on his behalf, that Petitioner made a serious error in judgment during the hearing before this Court. This mistake in choosing expediency over candor occurred at a time when Petitioner had not fully addressed the issues that led to his suspension. The hearing in front of the Supreme Court was in August, 2010. He went to DELAP in March 2011 and went to rehab at Caron in May 2011.[50] However, subsequently, through his treatment, counseling and consistent efforts to be responsible, Petitioner has acknowledged this issue and demonstrated his commitment to doing things right.

Evidence supporting is his performance as a law clerk, his interaction with his spiritual and psychological counselors, participation in Narcotics Anonymous and his consistency in following through on his commitments. After carefully reviewing the evidence, the Panel

---

[50] *Poliquin II*, at 2.

concludes that Petitioner has met his burden of demonstrating by clear and convincing evidence that he has the requisite honesty and integrity to resume the practice of law.

> 8. *Petitioner's resumption of practice will not be detrimental to the administration of justice.*

Petitioner has taken admirable steps to address his underlying performance issues. The evidence strongly supports his rehabilitation and fitness to practice. There are no reasons, from the Panel's perspective, to support a finding that his reinstatement would be detrimental to the administration of justice. Accordingly, the Panel finds that the Petitioner has demonstrated by clear and convincing evidence that his resumption of practice will not be detrimental to the administration of justice.

## Recommendation

Because the Panel after carefully considering the evidence before it has found that the Petitioner has established by clear and convincing evidence that he has met the criteria of Rule 22(g), it recommends that the Petition for Reinstatement be granted. However, in reviewing the Court's decisions on other reinstatement petitions,[51] the Panel observes that in the instances when the Petition for Reinstatement is granted, the Court usually imposes conditions to ensure continued ethical behavior.[52] The Panel suggests that such conditions would be appropriate in this instance as well. Accordingly, the Panel recommends that a two year probationary period be imposed upon Petitioner's reinstatement. During the period of probation, the Panel recommends that the following conditions be imposed:

1. Petitioner shall reimburse ODC for the costs of this proceeding, except for the costs attributed to the services of Dr. Mack. If he is unable to pay the costs immediately, ODC and Respondent shall enter into an agreement establishing a payment plan allowing him to pay the costs of these proceedings within the period probation.
2. Petitioner must obtain certification from the Delaware CLE authorities that he is current in his CLE requirements. Petitioner may not begin practicing law until those requirements are satisfied.
3. Petitioner shall not engage in the solo practice of law, without the prior written consent of ODC, which may be conditioned upon any reasonable terms and conditions it deems are appropriate to protect against Petitioner missing deadlines and appearances.
4. Respondent continue his agreement with DELAP, including the requirement of random drug testing and following its reasonable recommendations regarding

---

[51] See, e.g., *In re Pankowski.*
[52] *Ibid.*

14

counseling and training. DELAP will report to ODC on Respondent's compliance with this requirement on a quarterly basis during the term of the probationary period.

5. Petitioner must remain in his active recovery from his addiction by his continued participation in Narcotics Anonymous.

6. A practice monitor, other than his employer, shall be appointed to review Petitioner's work, including review of deadlines. They shall meet monthly during the first year of probation and no less than quarterly during the second year. The monitor shall report to ODC on a quarterly basis regarding Petitioner's performance.

7. The Petitioner will cooperate with ODC in monitoring his compliance with the terms of Probation.

8. Petitioner shall provide ODC with evidence that he is covered by legal malpractice insurance before he begins practicing law and he shall keep such insurance in full force and effect throughout his probationary period.

9. Any failure to comply with the terms of the probation may be grounds for discipline.

**CONCLUSION AND SIGNATURES ON THE FOLLOWING PAGE**

15

## Conclusion

For the reasons and with the conditions stated herein, we recommend that the Petition for Reinstatement be approved.

Respectfully Submitted,

Richmond L. Williams, Esquire (I.D. No. 2113)

Panel Chair

Deirdre McCartney, Esquire (I.D. No. 4290)

Panel Member

Deborah L. Miller, Ph.D.

Panel Member

Date: March 15, 2016

16